## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| LIBAN MUSE JAMA | ) | CASE NO. 1:12-CV-02881 |
| | ) | |
| Plaintiff | ) | JUDGE DAVID D. DOWD, JR. |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| UNITED STATES DEPARTMENT | ) | |
| of HOMELAND SECURITY, et al. | ) | |
| | ) | **REPORT AND RECOMMENDATION**[1] |
| Defendants. | ) | |
| | ) | |

Plaintiff Liban Muse Jama ("Plaintiff" or "Jama") is a native and citizen of Somalia who was admitted to the United States in 2000 and resides in the Northern District of Ohio.  Doc. 1, ¶¶ 2-3, 11, 16.   Jama currently is the respondent in a removal proceeding pending in the Immigration Court.  Doc. 1, ¶ 16.  Jama asks this Court to review several actions that defendant United States Citizenship and Immigration Service ("USCIS")[2] took before the removal proceeding began, specifically actions terminating his refugee status and denying his applications to adjust his status to that of a permanent resident and for a fraud waiver.  Doc. 1, p. 20[3] (Prayer for Relief); Doc. 26, p. 6.[4]

Jama asserts subject matter jurisdiction under 28 U.S.C. § 1331 (Federal Question Jurisdiction); 28 U.S.C. § 2201 (the Declaratory Judgment Act); and 5 U.S.C. § 555 and § 701, *et*

---

[1] This Report and Recommendation is provided pursuant to the Honorable David D. Dowd, Jr.'s December 5, 2012, Order referring this case to the undersigned.

[2] Jama named the following as additional defendants: Janet Napolitano, Secretary, United States Department of Homeland Security; Alejandro Mayorkas, Director, USCIS; Kim Adams, Director, USCIS Cleveland Field Office. Doc. 1.

[3] Citations to page numbers in ECF documents are to the ECF generated page numbers.

[4] The Prayer for Relief in Jama's Complaint does not ask the Court to review the denial of his request for a fraud waiver, although the Complaint does allege that the waiver was denied improperly. Doc. 1, ¶ 53.  However, in his Brief in Opposition to Defendants' Motion to Dismiss, Jama does ask the Court to review the fraud waiver denial. Doc. 26, p. 6.

*seq.* (the Administrative Procedure Act or "APA").  Doc. 1, ¶ 13.  Defendants filed a Motion to

Dismiss ("Motion") under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), arguing that

the Court lacks subject matter jurisdiction and that the Complaint fails to state a claim upon

which relief can be granted.  Doc. 14.  The undersigned ordered the Motion bifurcated in order to

consider the issue of subject matter jurisdiction first.  Doc. 19.[5]  Briefing as to subject matter

jurisdiction has been completed.

As discussed below, neither the USCIS's decision to terminate Jama's refugee status nor

its denial of his application for adjustment of status constitutes a final agency action, which is

required under the APA for judicial review.  Moreover, pursuant to 28 U.S.C. §§ 1252 (a)(5) and

1252 (b)(9), those actions are reviewable only in the Court of Appeals on a petition for review

following the conclusion of the removal proceeding in the Immigration Court and the Board of

Immigration Appeals.[6]  The denial of a fraud waiver application is a discretionary decision that,

under 8 U.S.C. § 1182(i), may not be reviewed by any court.   Accordingly, the undersigned

concludes that this Court lacks subject matter jurisdiction and recommends that Defendants'

Motion to Dismiss be **GRANTED** and that Plaintiff's Complaint be dismissed with prejudice.

Plaintiff's Motion to Strike Exhibits (Doc. 27) is hereby **DENIED.**[7]

---

[5] *See Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990) (requiring consideration of Rule 12(b)(1) motion prior to a Rule 12(b)(6) motion because, if the court lacks subject matter jurisdiction, the Rule 12(b)(6) challenge becomes moot); *see also Nassif v. Hansen*, 2008 U.S. Dist. LEXIS 121604, *13 (N.D. Ohio Mar. 21, 2008) (citing *Moir*, 895 F.2d at 269).

[6] While neither party directly argues the applicability of 8 U.S.C. § 1252(b)(9) to the denial of Jama's application to adjust status, for the reasons discussed below in Section V. B. regarding the USCIS's termination of Plaintiff's refugee status, that section does foreclose review by this Court of both actions.

[7] Because the undersigned has concluded that this case should be dismissed for lack of subject matter jurisdiction, the issues addressed in the Rule 12(b)(6) portion of Defendants' Motion will not be considered as that aspect of the Motion is moot.

## I.     Factual Background

Jama is a native and citizen of Somalia.  Doc. 1, ¶ 2, 16.  He was born on January 21, 1975.  Doc. 1, ¶ 21; Doc. 24-1, pp. 5-6 (Ex. 1); Doc. 24-1, p. 70 (Ex. 11).[8]  He is married and has five children.  Doc. 24-1, p. 5 (Ex. 1).  His wife and children reside in Kenya.  Doc. 24-1, p. 72 (Ex. 11).

### A.     Jama's Admission to the United States

On November 18, 1999, while at a refugee camp in Kenya, Jama signed and submitted a Form 1-590, Registration for Classification as Refugee, wherein he sought derivative refugee status as the child of a principal alien classified as a refugee pursuant to 8 U.S.C. § 1157(c)(2)(A).  Doc. 1, ¶ 22; Doc. 24-1, pp. 76-79 (Ex. 12).  In the Form 1-590, Jama listed his date of birth as January 21, 1985.  Doc. 24-1, p. 76 (Ex. 12).  He indicated that he was unmarried and had no children.  Doc. 24-1, p. 76 (Ex. 12).  He indicated that his mother was Dahabo Gelle Mohamed and his father was Muse Jama Ali.  Doc. 1, ¶ 22; Doc. 24-1, p. 79 (Ex. 12).  In signing the Form I-590, which stated that severe penalties existed for knowingly and willfully falsifying or concealing a material fact, Jama swore that the information was true and correct.  Doc. 24-1, pp. 77-79 (Ex. 12).  As part of the Form I-590 application process, Jama was required to establish that he was admissible to the United States.  Doc. 24-1, p. 78 (Ex. 12).  In order to establish his admissibility, Jama was required to indicate whether he fell within any of sixteen listed classes of aliens who would not be admissible.  Doc. 24-1, p. 78 (Ex. 12).  Jama stated that none of the sixteen classes of aliens applied to him, including the class of "[a]liens who have procured or attempted to procure a visa by fraud or misrepresentation."  Doc. 24-1, p. 78 (Ex.

---

[8] Citations to the Exhibits filed in support of Defendants' Motion to Dismiss are made to Doc. 24-1 (the redacted set of Exhibits).  The un-redacted, sealed set of Exhibits is contained in Doc. 25.  The Exhibit numbers in Doc. 24-1 correspond to the Exhibit numbers in Doc. 25.

12).  On January 26, 2000, the former INS[9] approved Jama's I-590 authorizing Jama to travel to the United States and be admitted as the child of an alien classified as refugee, i.e., a derivative refugee.  Doc. 1, ¶ 23, Doc. 24-1, p. 4 (Ex. 1); Doc. 24-1, p. 77 (Ex. 12).  Based on the I-590 approval, on May 16, 2000, Jama was admitted into the United States in New York City, New York as a derivative child of an alien classified as refugee.[10]  Doc. 1, ¶ 24, Doc. 24-1, p. 4 (Ex. 1); Doc. 24-1, p. 77 (Ex. 12).  On May 16, 2000, Jama in fact was 25 years of age and married with 5 children.  Doc. 24-1, p. 73-74 (Ex. 11).

**B.**      **Jama's Post-Admission Pre-Removal Proceedings**

On August 25, 2000, Jama filed a Form I-102, Application for Replacement/Initial Nonimmigrant Arrival-Departure Document seeking a replacement document because his original document had the wrong date of birth.  Doc. 1, ¶ 25; Doc. 24-1, p. 81 (Ex. 13).  On the I-102 Form, Jama stated that his date of birth was January 16, 1982.  Doc. 24-1, p. 81 (Ex. 13).  On May 25, 2001, the INS denied Jama's I-102 Application.  Doc. 1, ¶ 25; Doc. 24-1, p. 82 (Ex. 13).  In the denial notice, the INS noted the discrepancy between Jama's reported date of birth in his refugee application and the claimed date of birth in his I-102 Application and denied Jama's I-102 application because Jama had not credibly established that January 16, 1982, was his true date of birth.  Doc. 24-1, p. 82 (Ex. 13).  Subsequently, on November 12, 2010, when providing a sworn statement as part of a USCIS interview, Jama stated that he reported a date of birth of January 16, 1982, in his I-102 Application in order to obtain work.  Doc. 1, ¶ 25; Doc. 24-1, p. 70 (Ex. 11).  Jama indicated that, with a January 16, 1982, date of birth, he would be 18 years of age and eligible to work whereas, with his earlier reported date of birth of January 21, 1985, he

---

[9] The former INS (Immigration and Naturalization Service) ceased to exist on March 1, 2003, and the Department of Homeland Security took over various immigration functions.  Doc. 1, ¶ 5; Doc. 14, p. 10.

[10] Following his admission in 2000, Jama traveled in and out of the United States on subsequent occasions in 2004 and 2007.  Doc. 24-1, p. 32 (Ex. 5).

4

would not be 18 years of age and therefore would be ineligible for the security and cashier job he was seeking.  Doc. 24-1, p. 70 (Ex. 11).

On March 20, 2002, Jama filed his *first* Form I-485, Application to Register Permanent Residence or Adjust Status.  Doc. 1, ¶ 26; Doc. 24-1, p. 5 (Ex. 1); Doc. 24-1, pp. 111-120 (Ex. 19).[11]  On the I-485 Application, Jama listed his date of birth as January 21, 1975.  Doc. 24-1, p. 111 (Ex. 19).  He listed his mother's first name as Dahabo and his father's first name as Muse.  Doc. 24-1, p. 112 (Ex. 19).  He stated that he was not married and had no children.  Doc. 24-1, p. 112 (Ex. 19).  Jama signed his I-485 Application under penalty of perjury.  Doc. 24-1, p. 114 (Ex. 19).

On October 25, 2005, Jama filed Form I-821, Application for Temporary Protected Status, wherein he listed his date of birth as January 21, 1975.  Doc. 24-1, p. 87 (Ex. 15).  He listed no spouse and no children.  Doc. 24-1, p. 89 (Ex. 15).  He signed the I-821 under penalty of perjury.  Doc. 24-1, p. 91 (Ex. 15).  Additionally, on October 25, 2005, Jama filed Form I-765, Application for Employment Authorization, wherein he also listed his date of birth as January 21, 1975.  Doc. 24-1, p. 97 (Ex. 17).  He listed his marital status as single.  Doc. 24-1, p. 97 (Ex. 17).  On February 22, 2006, the USCIS denied Jama's I-821 Application (Doc. 24-1, p. 87 (Ex. 15)) and his I-765 Application (Doc. 24-1, p. 97 (Ex. 17)).

In 2008, through counsel, Jama inquired into the status of his *first* I-485 Application that had been filed in 2002.  Doc. 1, ¶ 27.  On February 3, 2009, the USCIS issued a Form I-72, Request for Evidence, instructing Jama to submit to a blood test to prove that he was the biological son of Dahabo Gelle Mohamed.  Doc. 1, ¶ 27; Doc. 24-1, p. 5 (Ex. 1).  On March 11, 2009, Jama filed a *second*  Form I-485, Application to Register Permanent Residence or Adjust

---

[11] One year after entry in the United States, an alien classified as a refugee is required to apply to the USCIS for adjustment of status for permanent residence.  8 U.S.C. § 1159; 8 C.F.R. § 209.1.

Status.  Doc. 1, ¶ 28; Doc. 24-1, pp. 99-109 (Ex. 18).  Jama's *second* I-485 Application listed his date of birth as January 21, 1975.  Doc. 24-1, pp. 99 (Ex. 18).  He also provided the name of his biological mother, Saqo Mohamed, the name of his spouse, Fadumo Adan, and his children's names.  Doc. 1, ¶ 28; Doc. 24-1, p. 101 (Ex. 18).  Jama indicated that his spouse and children all lived in Kenya.  Doc. 24-1, p. 101 (Ex. 18).  In response to a series of questions, Jama's *second* I-485 Application admitted that Jama obtained entry or refugee status by misrepresentation but also indicated that Jama "didn't think it was a misrepresentation because he was with his family."  Doc. 24-1, p. 102 (Ex. 18).

Thereafter, on March 17, 2009, Jama, through counsel, withdrew his *first* I-485 Application and submitted a statement that Dahabo Gelle Mohamed was his adopted mother and aunt, i.e., his mother's biological sister, and therefore parentage testing would be futile.  Doc. 1, ¶ 27; Doc. 24-1, p. 6 (Ex. 1).  Jama also explained that he considers Dahabo Gelle Mohamed to be his mother in accordance with Somali tradition.  Doc. 1, ¶ 27.  Jama indicated that, in Somali culture, this adoption is recognized as legal although there is no formal documentation.  Doc. 1, ¶ 27.

On November 12, 2010, Jama appeared at the Cleveland District Field Office of the USCIS in connection with his *second* I-485 Application.  Doc. 1, ¶ 29.  Jama was placed under oath and provided a sworn statement regarding his status in the United States.  Doc. 1, ¶ 29; Doc. 24-1, pp. 69-74 (Ex. 11).  Jama stated that his true date of birth is January 21, 1975.  Doc. 24-1, p. 70 (Ex. 11).  He stated that he had used other dates of birth, including 1985 and 1982.  Doc. 24-1, p. 70 (Ex. 11).  He used a date of birth of January 16, 1982, on his I-102 Application rather than his originally reported date of birth of January 21, 1985, so he could obtain a security and cashier job.  Doc. 24-1, pp. 70-71 (Ex. 11).  Jama stated that the January 21, 1985, date of birth

was used at the time of his admission because his aunt's daughter completed the form while they were in Kenya and it could not be changed at that time.  Doc. 24-1, p. 71 (Ex. 11).  He also stated that an American Government Officer filled out the Form I-590 in response to questions that his aunt primarily answered.  Doc. 24-1, pp. 71-72 (Ex. 11).  Jama stated that the only information that he directly supplied to the American Government Officer was his name.  Doc. 24-1, p. 72 (Ex. 11).  He stated that the true, full, and complete name of his biological mother is Saqo Gelle Mohammed and the true, full complete name of his biological father is Hersi Jama Yusuf.  Doc. 24-1, p. 70 (Ex. 11).  He stated that his biological mother died in 1981 and his biological father died in 1997.  Doc. 24-1, p. 70 (Ex. 11).   He stated that, by virtue of Somali custom rather than formal legal adoption proceedings, his aunt, Dahabo Gelle Mohammed, became his "mother" after his mother died.  Doc. 24-1, p. 71 (Ex. 11).  He admitted that he signed the Form I-590 on January 26, 2000, and that the fingerprint on the I-590 is his fingerprint.  Doc. 24-1, p. 72 (Ex. 11).   The sworn testimony concluded with Jama stating that he had never knowingly given false information under oath to a U.S. Immigration official in order to obtain an immigration benefit and that any false information submitted on his behalf was submitted by his aunt Dahabo or at her instruction.  Doc. 24-1, pp. 73-74 (Ex. 11).

### 1.     Termination of Jama's Refugee Status

On February 17, 2011, USCIS issued a Notice of Intent to Terminate Refugee Status ("NOIT").  Doc. 1, ¶ 30; Doc. 24-1, pp. 12-19 (Ex. 2).  The NOIT included references to the applicable statutes and regulations and summarized Jama's various applications and his sworn testimony.  Doc. 24-1, pp. 12-19 (Ex. 2).  Following its review of the entire record of proceedings and weighing of the evidence that Jama submitted in support of his status as a

refugee, the USCIS provided the following notice to Jama and advised him that it was the

USCIS's intent to terminate his refugee status:

> USCIS has determined that you have knowingly and willfully misrepresented material facts regarding your biographic information and knowingly and willfully given fraudulent statements while under oath to Immigration Officers and submitted numerous fraudulent documents while seeking entry into the United States and numerous immigration benefits.  USCIS has determined that you were ineligible for derivative refugee status at the time of your parole into the United States.  According to the record of proceeding, at the time of your Form I-590 on November 19, 1999, you were 24 years old. . . . By your own testimony, taken under oath before a USCIS Officer, you acknowledge that you were not admissible to the United States as a derivative child of an alien classified as a principal refugee in that Dahabo Gelle Mohamed is not your biological mother or legally adoptive mother, and that at the time you were in fact married to Faumo Isxaq Adan in Kenya and are the father of five children born your wife.  Finally, USCIS has determined that you have also failed to establish your own claim of well founded fear of persecution of your own merits in order to qualify you for refugee status within the meaning of section 101(a)(42) of the Act at the time of your admission into the United States.

Doc. 24-1, pp. 18-19 (Ex. 2).

Jama was provided thirty (30) days to submit documentation and/or testimony to refute

the determination of the USCIS and overcome the stated deficiencies.  Doc. 1, ¶ 30; Doc. 24-1,

p. 19 (Ex. 2).  On March 18, 2011, Jama, through counsel, responded to the NOIT.  Doc. 1, ¶ 30;

Doc. 24-1, pp. 126-139 (Ex. 21).  Jama argued, among other things, that the USCIS did not

provide him with the option or opportunity to establish his own claim as a refugee.  Doc. 24-1,

pp. 138-139 (Ex. 20).  Also, on March 18, 2011, Jama submitted a Form I-602, Application by

Refugee for Waiver of Grounds of Excludability.  Doc. 1, ¶ 30; Doc. 24-1, pp. 122-124 (Ex. 20).

In his I-602 Application, Jama indicated that he was inadmissible because of "willful and

material misrepresentations set forth in USCIS Notice to Terminate Refugee Status" and sought

a waiver of inadmissibility.  Doc. 24-1, p. 122 (Ex. 20).

On April 8, 2011, USCIS issued its Notice to Terminate Refugee Status.  Doc. 1, ¶ 31; Doc. 24-1, pp. 2-10 (Ex. 1).  After reviewing the record and considering Jama's response to the NOIT, the USCIS concluded that, although there are differences between the cultures of the United States and Somalia and although other individuals may have spoken on Jama's behalf, at the time Jama sought derivative refugee status, he could not have truly considered himself to be a child; he was 24 years of age, married and a father of 5 children.  Doc. 24-1, p. 10 (Ex. 1).  The USCIS concluded that, the mere fact that others gave false testimony on his behalf did not excuse Jama's own culpability in failing to provide truthful testimony pertaining to his own immigration benefit.  Doc. 24-1, p. 10 (Ex. 1).  The USCIS further concluded that Jama knowingly and willfully provided false testimony and evidence in seeking an immigration benefit for admission into the United States as a derivative child of a refugee and that he therefore is ineligible for the benefit.  Doc. 24-1, p. 10 (Ex. 1).

### 2. Denials of Adjustment of Status and Fraud Waiver

Also, on April 8, 2011, the USCIS denied Jama's I-602 Application (Doc. 24-1, pp. 27-28 (Ex. 4)) and his *second* Form I-485 Application (Doc. 24-1, pp. 24-25 (Ex. 3)).  The USCIS denied Jama's I-602 Application because his refugee status had been terminated and therefore he was ineligible to have a Form I-602 approved on his behalf.  Doc. 24-1, p. 28 (Ex. 4).  Similarly, the USCIS denied Jama's *second* I-485 Application because his refugee status had been terminated.  Doc. 25, p. 25 (Ex. 3).  The USCIS advised Jama that, although its decision could not be appealed, he could file a motion to reconsider or a motion to reopen.  Doc. 24-1, p. 25 (Ex. 3).  On April 12, 2011, Jama filed a motion reopen the USCIS's decisions to terminate his refugee status and deny his application to adjust status.  Doc. 1, ¶ 32; Doc. 24-1, pp. 30-31 (Ex. 5).  On April 14, 2011, Jama's application to reopen was denied.  Doc. 24-1, p. 30 (Ex. 5).

**C.**       **Removal Proceeding Pending in the Immigration Court**

On August 17, 2011, the USCIS initiated removal proceedings with a Notice to Appear[12] before an immigration judge of the United States Department of Justice to show why he should not be removed from the United States.  Doc. 24-1, pp. 59-60 (Ex. 8).  On February 6, 2012, Additional Charges of Inadmissibility/Deportability were issued to amend and add allegations in support of removal.[13] Doc. 24-1, pp. 62-63 (Ex. 9).

On August 18, 2011, the USCIS referred Jama's separately filed Form I-589, Application for Asylum and for Withholding of Removal (Doc. 24-1, pp. 44-54 (Ex. 6) to an immigration judge for adjudication in the removal proceeding (Doc. 24-1, pp. 56-57 (Ex. 7)).  In its Referral Notice, the USCIS informed Jama that he could request asylum again before the immigration judge.  Doc. 24-1, p. 56 (Ex. 7).

In 2012, the immigration judge issued decisions in the removal proceedings, including a June 14, 2012, Memorandum and Order regarding Removability (Doc. 28-1) and an August 8, 2012, Memorandum and Order regarding Motion to Reconsider (Removability) (Doc. 26-1).  Plaintiff's asylum claims remain pending before the immigration court and are scheduled for hearing.  Doc. 28, p. 7, Doc. 28-2, p. 3.

---

[12] The "Notice to Appear" is on letterhead from the "U.S. Department of Justice – Immigration and Naturalization Service."  Doc. 24-1, p. 59.  As discussed in FN 9 above, the INS ceased to exist in 2003.  Thus, it is unclear, why, in 2011, INS letterhead was used.  However, the parties do not contend that an entity other than the USCIS initiated removal proceedings.  Defendants assert in their Motion to Dismiss that removal proceedings were initiated by the USCIS.  Doc. 14, p. 15.  Plaintiff acknowledges that removal proceedings are pending (Doc. 1, ¶ 16) and, while Plaintiff challenges action taken by the USCIS, Plaintiff does not dispute Defendants' contention that it was the USCIS that initiated removal proceedings.  *See Nijjar v. Holder*, 689 F.3d 1077, 1079, n.8 & n. 10 (9th Cir. 2012) (commenting on the USCIS's use of an outdated INS form).

[13] The "Additional Charges of Inadmissibility/Deportability" is also on INS letterhead.  As with the "Notice to Appear," the parties do not dispute that the "Additional Charges of Inadmissibility/Deportability" were in fact issued by the USCIS.  Doc. 14, p. 15.

## II.     Plaintiff's Claims

Plaintiff's Complaint purports to set forth four Causes of Action.[14]  However, a number of his claims are not in fact claims.  Rather they are arguments in support of his principal contention, which is that the USCIS erred in its decision to terminate his refugee status without determining that he would not have qualified as a refugee in his own right at the time he was admitted and/or that the USCIS had an affirmative duty to elicit facts regarding whether he could have qualified in his own right at that time.[15]  For example, Jama describes his lawsuit as a "challenge [to] the decision of the USCIS to deny him permanent residency in the United States by unlawfully terminating his status as a refugee in the United States."  Doc. 1, ¶ 1.  He alleges that "an alien who has been admitted as a 'refugee' . . . may not have his refugee status terminated until there has been a prior determination that such alien was not a 'refugee' at the time of admission" and "[n]o such 'prior determination' was ever made in this case."  Doc. 1, ¶ 5.  Further, he alleges that "despite . . . being deposed by the USCIS before his status was terminated, he was not asked any questions pertaining to the core issue of whether or not he met the definition of 'refugee' at the time of admission."  Doc. 1, ¶ 5.   He argues that the USCIS's

---

[14] Plaintiff's four Causes of Action are: "Count 1. Violation of Due Process;" "Count 2. Any misrepresentation in Mr. Jama's immigration record are immaterial as he meets the definition of refugee at the time of admission within the meaning of the Immigration and Nationality Act and the U.N. Protocol and Convention;" "Count 3. Termination of Mr. Jama's refugee status by USCIS contradicts the principles of the U.N. Convention;" and "Count 4.  The U.S. Department of Homeland Security has no authority to terminate refugee status."  Doc. 1, ¶¶ 33-66.  Plaintiff also requests attorney fees and expenses under the Equal Access to Justice Act.  Doc. 1, ¶ 67.

[15] Although Count 1 of the Complaint is captioned "Violation of Due Process," the references to due process that Jama makes in his Brief in Opposition to the Motion are made as part of his argument that the decisions of the USCIS that he challenges are final agency actions and are not exempt from judicial review under 8 U.S.C. § 1252. Doc. 26, pp. 18, 20.  To the extent that Jama asserts a procedural due process claim, the allegations on the face of the Complaint appear to contradict such a claim since Jama acknowledges that the USCIS issued a Notice of Intent to Terminate Refugee Status and that he had the opportunity to, and did, respond to the NOIT with the assistance of counsel.  Doc. 1, ¶¶ 30, 33.  Accordingly, any such claim is not colorable and is subject to dismissal, _Hamdi v. Napolitano_, 620 F.3d 615, 624 (6th Cir. 2010) (claim invoking federal question jurisdiction may be dismissed for lack of subject matter jurisdiction if it is not colorable).  Neither Jama's Complaint nor his Brief in Opposition clearly articulates a substantive due process claim.

"action of terminating Mr. Jama's refugee status is a final and non-appealable decision."  Doc. 26, p. 6.  Therefore, Jama argues that this lawsuit "provides the only opportunity for Mr. Jama to have a fair and complete review of the agency's decisions both to terminate his refugee status and subsequently to deny his adjustment of status and waiver applications."  Doc. 26, p. 6.

### III. Standard of Review – Rule 12(b)(1) – Lack of Subject Matter Jurisdiction

In cases where a defendant raises the issue of lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive a motion to dismiss.  *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990); *see also DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004).  "A court lacking jurisdiction cannot render judgment but must dismiss the case at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking."  *Basso v. Utah Power & Light, Co.*, 495 F.2d 906, 909 (10th Cir.1974); *Bennett v. U.S. Postal Service*, 2012 WL 5463822, *2 (N.D. Ohio Nov. 8, 2012) (quoting *Basso*, 495 F.2d at 909 and quoting *Kusens v. Pascal Co.*, 448 F.3d 349, 359 (6th Cir. 2006) for the proposition that "federal courts are under an independent obligation to examine their own jurisdiction.").

Motions to dismiss for lack of subject matter jurisdiction fall into two general categories: facial attacks and factual attacks.[16]  *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994).  A facial attack on subject matter jurisdiction goes to whether the plaintiff has properly alleged a basis for subject matter jurisdiction, and the trial court takes the allegations of the complaint as true and construes them in a light most favorable to the non-moving party.  *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990); *Smith v. Encore Credit Corp.*, 623

---

[16] "Regardless of the type of attack, Plaintiff, as the party invoking federal subject matter jurisdiction, bears the burden of persuading the Court that subject matter jurisdiction exists."  *Kobaivanova v. Hansen*, 2011 U.S. Dist. LEXIS 105252, *5 (N.D Ohio Sept. 16, 2011) (citing *Dismas Charities, Inc. v. U.S. Dep't of Justice*, 401 F.3d 666, 671 (6th Cir. 2005)); *see also Zhang v. Sec'y of Homeland Security*, 2007 U.S. Dist. LEXIS 64754, * 6-7 (N.D. Ohio Aug. 31, 2007) (quoting *Moir*, 895 F.2d at 269).

F.Supp.2d 910, 914 (N.D. Ohio 2008), *Nassif v. Hansen*, 2008 U.S. Dist. LEXIS 121604, * 13-14 (N.D. Ohio Mar. 21, 2008).  A factual attack is "a challenge to the factual existence of subject matter jurisdiction." *Ritchie*, 15 F.3d at 598.  "[N]o presumptive truthfulness applies to the factual allegations . . . and the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case."  *See Ritchie*, 15 F.3d at 598 (citing *Ohio Nat'l Life Ins. Co*, 922 F.2d at 325) ; *Moir*, 895 F.2d at 269; *RMI Titanium Co. v. Westinghouse Elec. Corp*., 78 F.3d 1125, 1135 (6th Cir. 1996).

In this case, the Motion could have been briefed as a facial attack on the existence of subject matter jurisdiction.  However, both parties have submitted and have referred to Exhibits. Doc. 24-1, Doc. 26-1, Doc. 28-1, Doc. 28-2.  Thus, evidence outside the pleadings has been considered herein. *Moir*, 895 F.2d at 269; *Ritchie*, 15 F.3d at 598.

### IV. Statutory and Regulatory Framework

The statutory and regulatory framework that applies to immigration matters is complex. Five executive branch departments currently have responsibilities relating to immigration.[17] Pursuant to statutory amendments, responsibilities have shifted among agencies over the years. For example, "On March 1, 2003, various immigration enforcement responsibilities of the Attorney General were transferred to the Secretary of the newly created Department of Homeland Security."  *See Diouf v. Napolitano*, 634 F.3d 1081, 1085, n. 5 (9th Cir. 2011) (citing Homeland Security Act of 2002, Pub. L. No. 107–296, 116 Stat. 2135).  As a result, some statutory references to Attorney General are to be read to include the Director of Homeland Security and/or USCIS.  *See* 6 U.S.C. § 557 (the "reference in any other Federal law to any

---

[17]  They are the Department of Homeland Security, the Department of State, the Department of Justice, the Department of Labor, the Department of Health and Human Services, and the Social Security Administration. *See* David Weissbrodt & Laura Danielson, *Immigration Law and Procedure in a Nutshell*, Sixth Edition, (2011).

department, commission, or agency or any officer or office the functions of which are so transferred shall be deemed to refer to the Secretary, other official, or component of the Department to which such function is so transferred.")  *See also Buddhi v. Holder*, 344 Fed. Appx. 280, 284, n. 1 (7th Cir. 2009) (concluding that, where the Homeland Security Act of 2002 transferred responsibilities from the Attorney General to the Secretary of Homeland Security, 6 U.S.C. § 202 and 6 U.S.C. § 557 require the court to read references to the  Attorney General as references to the Secretary of Homeland Security); *but see Nijjar v. Holder*, 689 F.3d 1077, 1085-1086 (9th Cir 2012) (concluding that the governing asylum statute confers exclusive authority on the Attorney General to terminate asylum status).

The USCIS is an agency within the Department of Homeland Security.  *Nijjar*, 689 F.3d at 1078 (noting that, in 2003, USCIS was one of the newly created agencies within the Department of Homeland Security).  The Immigration Court and the Board of Immigration Appeals are housed within the Department of Justice.  *Id.* at 1078, n. 2 (noting that the Executive Office of Immigration Review (EOIR), part of the Department of Justice, includes immigration judges and the Board of Immigration Appeals).

## A.    Admission as a Derivative Refugee.

The statute that governs the admission of refugees is 8 U.S.C. § 1157.  A spouse or child of a refugee may qualify for admission under 8 U.S.C. § 1157(c)(2).  Any such "spouse or child . . . of any refugee who qualifies for admission" under § 1157(c)(1) "shall . . . be entitled to the same admission status as such refugee if accompanying, or following to join, such refugee and if the spouse or child is admissible (except as otherwise provided under paragraph (3)) as an immigrant under this Act."  8 U.S.C. § 1157(c)(2); *see also*  8 C.F.R. § 207.7 (setting forth requirements pertaining to derivatives of refugees).  "The burden of proof is on the petitioner to

14

establish by a preponderance of the evidence that any person on whose behalf he/she is making a request under this section is an eligible spouse or unmarried, minor child." 8 C.F.R. § 207.7(e). For purposes of 8 U.S.C. § 1157(c)(2), a "child means an unmarried person under twenty-one years of age who" satisfies the provisions of 8 U.S.C. § 1101(b)(1)(A)-(E). 8 U.S.C. § 1101(b)(1). Certain relatives of refugees, including nephews and nieces, are ineligible for derivative refugee benefits. 8 C.F.R. § 207.7(b)(6).

Except as provided in 8 U.S.C. § 1157(c)(3), an individual must be "admissible" in order to be admitted as a refugee. 8 U.S.C. § 1157(c)(2). "Any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other [immigration] benefit" is inadmissible. 8 U.S.C. § 1182(a)(6)(C).

**B.**    **Termination of Refugee Status.**

The Attorney General may terminate refugee status "pursuant to such regulations as the Attorney General may prescribe if the Attorney General determines that the alien was not in fact a refugee within the meaning of section 101(a)(42) [8 U.S.C. § 1101(a)(42)] at the time of the alien's admission."[18] 8 U.S.C. § 1157(c)(4). The regulations provide that notice of intent to terminate shall be issued; the alien shall thereafter have a period of time to present written or oral evidence to show why his refugee status should not be terminated; there is no appeal from the USCIS's termination of refugee status; and, upon termination, the USCIS will begin the removal process. 8 C.F.R. 207.9. Specifically, the regulations state:

> The refugee status of any alien (and of the spouse or child of the alien) admitted to the United States under section 207 of the Act will be terminated by USCIS if

---

[18] While the statute refers to "Attorney General," the regulation refers to "USCIS." 8 U.S.C. § 1157; 8 C.F.R. § 207.9. As part of his Complaint, Plaintiff alleges that the Department of Homeland Security has no authority to terminate refugee status. The merits of that claim are not considered herein.

the alien was not a refugee within the meaning of section 101(a)(42) of the Act at the time of admission. USCIS will notify the alien in writing of its intent to terminate the alien's refugee status. The alien will have 30 days from the date notice is served upon him or her in accordance with 8 CFR 103.8, to present written or oral evidence to show why the alien's refugee status should not be terminated. There is no appeal under this chapter I from the termination of refugee status by USCIS. Upon termination of refugee status, USCIS will process the alien under sections 235, 240, and 241 of the Act.

8 C.F.R. 207.9.

## V.  Law and Analysis

In their briefing on subject matter jurisdiction, the parties have focused their arguments on the Administrative Procedure Act, specifically on the issue of whether Jama's request that the Court review the USCIS's termination of his refugee status, denial of his adjustment status, and denial of his fraud waiver application (Doc. 26, p. 6) are actions that are reviewable under the APA.  That is because neither the federal question statute nor the Declaratory Judgment Act, the other jurisdictional predicates alleged in the Complaint, provides any substantive right or claim. The federal question statute, 28 U.S.C. § 1331, provides "the general grant of civil federal question jurisdiction to district courts for actions arising under the Constitution, laws, or treaties of the United States."   *Sabhari v. Reno*, 197 F.3d 938, 943 (8th Cir. 1999).  However, "§ 1331 does not, in and of itself, create substantive rights in suits brought against the United States." *Id.* [19]  "The Declaratory Judgment Act [28 U.S.C. § 2201] does not extend jurisdiction beyond what is authorized by Congress, it merely enlarges the range of remedies available in federal courts." *Elgin Assisted Living EB-5, LLC v. Mayorkas*, 2012 U.S. Dist. LEXIS 148686, * 4 (N.D. Ill. Oct. 16, 2012) (citing *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671-672

---

[19] *See also* *Kobaivanova v. Hansen*, 2011 U.S. Dist. LEXIS 105252, *13 (N.D. Ohio Sept. 16, 2011) (Section 1331 "only supports jurisdiction when the complaint pleads a violation of a substantive right under a distinct federal statute."); *Zhang v. Sec'y of Homeland Sec.*, 2007 U.S. Dist. LEXIS 64754, * 8 (N.D. Ohio Aug. 31, 2007) (without a further allegation of a violation of federal statute, 28 U.S.C. § 1331 does not provide the district court with jurisdiction).

(1950); *see also Zhang*, 2007 U.S. Dist. LEXIS 64754, 8 (N.D. Ohio Aug. 31, 2007) (also citing *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671-72 (1950)).

In order for a party to use § 1331 to obtain relief against the United States, there must be some additional authority that waives the government's sovereign immunity.  The APA provides such authority.  *Sabhari v. Reno*, 197 F.3d 938, 943 (8th Cir. 1999) ("waiver [of sovereign immunity] may be found in the Administrative Procedure Act.").[20]  *See also* 5 U.S.C. § 702; *Hamdi v. Napolitano*, 620 F.3d 615, 623 (6th Cir. 2010) (APA's waiver of sovereign immunity allowed claim to proceed under federal court's federal question subject matter jurisdiction, although claim was barred under Rule 12(b)(6)).  Numerous cases, including cases decided in this District (*see, e.g., Zhang*, 2007 U.S. Dist. LEXIS 64754, * 13-15 (N.D. Ohio Aug. 31, 2007)), have applied the APA's judicial review provision, including in particular its requirement that agency action be final before it is subject to judicial review, in determining whether jurisdiction exists to review the action of an immigration agency.  Both sides in this case have briefed the issue under the APA and the undersigned believes it appropriate to apply the finality requirement of the APA's judicial review provision here.

The APA both provides for, and limits, judicial review.  The APA expressly does not permit judicial review in those instances where "statutes preclude judicial review" or "agency action is committed to agency discretion by law."  5 U.S.C. § 701(a); *Shah v. Hansen*, 2007 WL 2322353, * 3 (N.D. Ohio Oct. 31, 2007); *Zhang*, 2007 U.S. Dist. LEXIS 64754, * 15.  Section 704 of the APA authorizes judicial review of:

> Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review.

---

[20] *Cf. Ardestani v. INS*, 502 U.S. 129, 133-134 (1991), where, in an Equal Access to Justice Act (EAJA) petition for attorney fees, the Supreme Court held that the APA does not govern proceedings that take place before an immigration agency itself.

5 U.S.C. § 704; *Zhang*, 2007 U.S. Dist. LEXIS 64754, * 13-14.

**A.**    **This Court lacks jurisdiction over the USCIS's actions challenged by Jama because they are not final agency actions.**

Jama does not identify any statute that expressly makes the USCIS's actions he challenges reviewable in District Court.  Therefore, under APA § 704, quoted above, they are not reviewable unless they constitute "final agency action[s] for which there is no other adequate remedy in a court . . . ."   In *Bennett v. Spear*, 520 U.S. 154, 177-178 (1997), the Supreme Court established a two-pronged test for determining whether an agency action is "final":

> First, the action must mark the 'consummation' of the agency's decisionmaking process - - it must not be of a merely tentative or interlocutory nature." *Id.* (internal citations omitted).  "[S]econd, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow."

*Id.* (internal citations omitted).

**First Prong of the Finality Test.**  Jama points to three bases for his position that the USCIS's actions meet the first prong of the finality test, i.e., that they marked the consummation of the agency's decisionmaking process:  (1) there is no mandatory appeal from a decision to terminate refugee status (Doc. 26, pp. 13-14); (2) the Immigration Judge has no jurisdiction to review the USCIS's termination of his refugee status (Doc. 26, pp. 9-13); and (3) because the denial of his adjustment of status application was based on his refugee status, he allegedly is precluded from renewing his application for adjustment of status absent his refugee status being reinstated.  Doc. 26, p. 12.

Defendants assert that the USCIS's termination of Jama's refugee status did not mark the consummation of the agency's decisionmaking process.  Doc. 14, p. 17.  Defendants rely on the regulation that requires the USCIS to initiate removal proceedings following a decision to terminate an alien's refugee status.  8 C.F.R. § 207.9.  As a result, Defendants reason,

termination of refugee status is only an intermediate step in the removal of an alien and, because a removal proceeding follows, further administrative relief is available to the alien.  Doc. 26, p. 14.  In addition, Defendants argue that the decision is not final because Plaintiff has the ability to renew his application to adjust status during the removal proceedings.  Doc. 26, pp. 17-18 (citing 8 U.S.C. § 1159(a)(1)(A), 8 C.F.R. §§ 245.2(a)(5)(ii), (c), 1245.2(a)).

Neither Plaintiff nor Defendants have cited to any case that specifically addresses the precise issue here, i.e., whether the USCIS's termination of an alien's refugee status constitutes final agency action.  However, the parties do cite cases that have considered whether the USCIS's termination of an alien's asylee status or its denial of an application to adjust status is final agency action within the meaning of the APA.  These cases provide a useful framework for resolving the issues before this Court.

The Fifth Circuit, in *Qureshi v. Holder*, 663 F.3d 778, 781-782 (5th Cir. 2011), held that the district court lacked jurisdiction to consider plaintiffs' challenge to the USCIS's termination of plaintiffs' asylum where removal proceedings were pending because "termination of asylum cannot be viewed as a 'consummation' of agency decisionmaking" and therefore is not final agency action.  The Fifth Circuit reasoned that "[t]ermination of asylum automatically triggers another state of decision-making, the removal proceeding.  Pending removal proceedings make termination an intermediate, nonfinal action, because 'when removal proceedings are pending, further administrative relief is available.'"  *Id.* at 781 (citing *Cabaccang v. USCIS*, 627 F.3d 1313, 1317 (9th Cir. 2010)).  The Fifth Circuit concluded that termination of asylee status is not final agency action "[e]ven if the IJ [immigration judge] and BIA [board of immigration appeals] lack jurisdiction to review asylum termination decisions" because "they both retain the power to halt removal proceedings altogether, either by an alien's successful contest to removability . . . or

by a successful new asylum application . . .").  *Qureshi,* 663 F.3d at 781.

In *Cabaccang,* the Ninth Circuit held that "district courts lack jurisdiction to review denials of status adjustment if removal proceedings are simultaneously pending."  *Cabaccang,* 627 F.3d at 1317; *cf. Pinho v. Gonzales,* 432 F.3d 193, 200-202 (3d Cir. 2005) (finding jurisdiction over a plaintiff's challenge to the denial of his adjustment status where there were no removal proceedings pending).   In *Cabaccang,* the Ninth Circuit was not persuaded by plaintiffs' argument that their removal proceedings were being handled by the Executive Office for Immigration Review, i.e., Immigration Court, a Department of Justice agency, whereas their applications to adjust status were denied by a different agency, the USCIS, a Department of Homeland Security agency and there was no review of their adjustment of status available within the USCIS itself.  *Id* at 1316.  The Ninth Circuit found that the "crucial consideration" was not the distinction between agencies but the fact that "the IJ may completely wipe away the USCIS's prior decision."  *Id.*  Plaintiff makes a similar argument in this case (Doc. 26, pp. 9-10) which is unpersuasive for the reasons articulated in *Cabaccang.*

Jama relies on two District Court opinions that have held that that the USCIS's decision to terminate a plaintiff's asylee status was the consummation of the agency's decisionmaking process and therefore final agency action subject to judicial review.  *Singh v. USCIS*, 2011 U.S. Dist. LEXIS 42019, * 9-11 (N.D. Ill. Apr. 19, 2011) and *Sidhu v. Bardini*, 2009 U.S. Dist. LEXIS 48808 (N.D. Cal. June 10, 2009).  *Singh* relied on *Sidhu* for its conclusion "that the USCIS's termination decision was final because: (1) the plaintiff had no right to appeal that decision; (2) the plaintiff would bear the burden of proving a new asylum claim in the removal proceeding whereas the defendants [USCIS] had borne the burden of proving it had a valid reason to terminate asylum status . . .; and (3) the termination of the plaintiff's asylum had a

direct and immediate effect on the plaintiff's day-to-day life, including the loss of the plaintiff's

legal right to live and work in the United States, and to travel in and out of the United States.").

*Singh*, 2011 U.S. Dist. LEXIS 42019, * 9-11.

The reasoning in *Sidhu* has been undercut by the Ninth Circuit's subsequent decision in

*Cabaccang*.  Indeed, a recent Northern District of California case found that *Sidhu* is "no longer

germane."  *Singh v. Bardini*, 2012 U.S. LEXIS 24309, *9-11 (N.D. Cal. Feb. 27, 2012) (finding

that *Cabaccang* rejected the reasoning in *Sidhu* and instructs that the USCIS's decision to

terminate an alien's status is not final where an immigration judge, in the course of removal

proceedings, has the ability to grant the alien relief during the removal process).  Because *Singh*

(N.D. Ill.) relied on *Sidhu*, its reasoning also has been undercut.   Moreover, the analysis and

rationale contained in *Qureshi*, *Cabaccang*, *Pinho* and other cases relied on by Defendants are

more persuasive than the reasoning of the District Courts in *Singh* (N.D. Ill.) *and Sidhu.*

Applying that reasoning to this case, Jama admits in his Complaint that removal proceedings are

pending.  Doc. 1, ¶ 16.  The pending removal proceedings resulted from the termination of

Jama's refugee status because the USCIS is required by regulation to initiate removal

proceedings following termination of refugee status.  8 C.F.R. § 207.9 ("Upon termination of

refugee status, USCIS will process the alien under sections 235, 240 and 241 of the Act.").

Thus, rather than marking the "consummation of the agency's decisionmaking process," the

USCIS's termination of Jama's refugee status was only an intermediate step in that process.  See

*Bennett*, 520 U.S. at 177-178.

Plaintiff argues that, if this Court does not review the USCIS's action, he will be denied

the opportunity to be heard on the USCIS's termination of his refugee status.  However, the APA

provides that "[a] preliminary, procedural, or intermediate agency action ruling not directly

reviewable is subject to review on the review of the final agency action."  5 U.S.C. § 704.

Accordingly, while not reviewable at this time, once the agency's decision is in fact final, which

will occur at the conclusion of proceedings in the Immigration Court and the Board of

Immigration Appeals, Plaintiff may seek review of intermediate agency actions, including the

termination of his refugee status, in the Court of Appeals.  *See Qureshi*, 663 F.3d at 780, n. 2

(stating that although "[n]either the IJ nor the BIA has authority to review the USCIS's decision

to terminate asylum . . . [b]ut if the BIA upholds the final order of removal, the ex-asylee may

then appeal to the appropriate circuit court to review 'constitutional claims or questions of law'

underlying the final order of removal, including direct challenges to USCIS's original decision")

(internal citation omitted); *see* 8 U.S.C. § 1252(a)(2)(D)(providing that "[n]othing . . . in any

other provision of this chapter (other than this section) which limits or eliminates judicial review,

shall be construed as precluding review of constitutional claims or questions of law raised upon a

petition for review filed with an appropriate *court of appeals* in accordance with this section.")

(emphasis supplied); *see also Nijjar v. Holder*, 689 F.3d 1077 (9th Cir. 2012) (on a petition for

review following proceedings in the Immigration Court and Board of Immigration Appeals, the

circuit court reviewed the USCIS's termination of the petitioner's asylum status notwithstanding

that the Immigration Judge lacked jurisdiction to review the termination of asylum status).

    In addition, Plaintiff maintains the ability to renew his adjustment status application

during the removal proceedings pursuant to 8 C.F.R. § 1245.2 (a), which provides that "[i]n the

case of any alien who has been placed in deportation proceedings or in removal proceedings

(other than as an arriving alien), the immigration judge hearing the proceeding has exclusive

jurisdiction to adjudicate any application for adjustment of status the alien may file."  Jama

argues that Defendants incorrectly rely on adjustment status regulations that relate to approved

underlying immigrant petitions, rather than adjustment of status of refugees.  Doc. 26, p. 13.
However, the regulations that Jama himself argues are applicable make clear that he can renew
his application for adjustment in removal proceedings.  Doc. 26, p. 13, n. 6 (referencing 8 C.F.R.
§ 209.1(e) ("Adjustment of status of refugees"); *see also* 8 C.F.R. § 1209.1(e) ("There is no
appeal of the denial of an application by the director, but such denial will be without prejudice to
the alien's right to renew the application in removal proceedings under part 240 of this
chapter.").[21]

     Defendants argue that Jama may renew his adjustment status application.  Doc. 14, p. 19.
This argument is made, in part, to demonstrate that Jama has failed to exhaust administrative
remedies. Doc. 14, p. 19.[22]  However, even if, as Jama contends, the doctrine of failure to
exhaust administrative remedies is insufficient, in and of itself, to warrant dismissal of his
Complaint,[23] the fact that he maintains the ability to renew his adjustment status application
during the pendency of removal proceedings and the fact that removal proceedings are pending
do demonstrate the lack of finality in the USCIS's decision to deny Plaintiff's application to
adjust status.  *See Cabaccang*, 627 F.3d at 1316 (where removal proceedings are pending a
denial of an adjustment status application was determined not to be final agency action).

     **Second prong of the finality test.**  Jama argues that the USCIS's actions meet the
second prong of the *Bennett* finality test, i.e., actions "by which 'rights or obligations have been

---

[21] For the reasons discussed herein, there is no final agency action for which Plaintiff may seek judicial review.
Thus, although the parties also disagree what, if any, impact Jama's asylum application, which is pending before the
Immigration Court in the removal proceeding, has on the finality of the USCIS's termination of refugee status
and/or denial of his application to adjust status (Doc. 14, p. 18, n. 3; Doc. 26, pp. 10-11) it is not necessary for the
Court to address those arguments.

[22] The parties separately argue both finality under the APA and failure to exhaust administrative remedies.
However, because, for the reasons stated herein, there is no final agency action, it is not necessary to address the
parties' arguments regarding failure to exhaust administrative remedies.

[23] *See Bangura v. Hansen*, 434 F.3d 487, 498 (6th Cir. 2006) (doctrine of exhaustion of administrative remedies did
not bar claim under the APA).

determined,' or from which 'legal consequences will flow,'" 520 U.S. at 177-178, because the consequences to him flowing from the termination of his refugee status are actual and concrete (Doc. 26, p. 14).  He contends that, upon termination of his refugee status, he lost his right to apply for adjustment status, his right to work, travel and apply for naturalization, and he was eventually placed in removal proceedings.  Doc. 26, p. 14. However, for the reasons set forth above, even if Jama could meet the second, "legal consequences," prong of the finality test, he cannot meet the first prong, "consummation of the agency's decisionmaking process."  Thus, it is unnecessary to address whether the alleged "consequences" are sufficient to satisfy the second prong.  *See e.g., Qureshi*, 663 F.3d at 782, n. 11.

     Because Jama seeks review by this Court of USCIS decisions that do not mark the consummation of agency action, the Court lacks jurisdiction to review his claims.

**B.**    **Under 8 U.S.C. § 1252 (a)(5) and 8 U.S.C. § 1252(b)(9), this Court lacks jurisdiction over the USCIS's termination of Plaintiff's refugee status because it is an action taken to remove an alien from the United States.**

     In 8 U.S.C. § 1252 (b)(9) and 8 U.S.C. § 1252 (a)(5), Congress has acted to channel review of certain immigration decisions to the Courts of Appeal.  Section 1252(a)(5) provides that "a petition for review filed with an appropriate court of appeals . . . shall be the sole and exclusive means for judicial review of an order of removal.. . ." (Emphasis supplied.)  Section 1252 (b)(9) provides:

> Judicial review of all questions of law and fact, including interpretation of constitutional and statutory provisions, arising from any action taken *or* proceeding brought to remove an alien . . . shall be available only in judicial review of a final order under this section.

     The Supreme Court has referred to 8 U.S.C. § 1252(b)(9) as "an unmistakable 'zipper' clause," the purpose of which is to "channel review of *all* legal and factual questions that arise from the removal of an alien into the administrative process, with judicial review of those

decisions vested exclusively in the courts of appeal." *Aguilar v. ICE*, 510 F.3d 1, 9-13 (1st Cir. 2007) (emphasis in original) (citing *Reno v. Am.-Arab Anti-Discrim. Comm.*, 525 U.S. 471, 482-483 (1999)). In *Aguilar*, the First Circuit concluded that, even though challenged action, including constitutional claims stemming from detention of more than 300 undocumented workers, occurred *prior* to any formal removal proceeding, 8 U.S.C. 1252(b)(9) still applied. *Aguilar*, 510 F.3d at 15. While 8 U.S.C. § 1252 (b)(9) is not a claim-barring statute, it is a judicial channeling provision that can prevent piecemeal review. *Aguilar*, 510 F.3d 1, 12-13, 18 (indicating that "[i]n enacting section 1252 (b)(9), Congress plainly intended to put an end to the scattershot and piecemeal nature of the review process that previously had held sway in regard to removal proceedings.") (internal citations omitted).

Jama argues that section 1252(b)(9) does not apply here since he does not seek review of decisions made in the removal proceeding itself. He contends that, because the USCIS's termination of his refugee status decision preceded the removal proceeding, it cannot be said to "arise from" the removal proceeding. Doc. 26, p. 19. He also argues that, even if 8 U.S.C. § 1252 (b)(9) applies to some actions that occur prior to the initiation of removal proceedings, the Immigration Court lacks jurisdiction to review the USCIS's termination of his refugee status and therefore, the issues he raises in this case cannot be effectively handled through the available administrative process. Doc. 26, p. 19 (arguing that his claims fall within the limiting language of *Aguilar*, 510 F.3d at 11, wherein the First Circuit concluded that the words "arising from" in § 1252 (b)(9) should be read to exclude claims that are "collateral" to removal proceedings).

Plaintiff's arguments are unpersuasive. As quoted above, 8 U.S.C. § 1252 (b)(9) applies to "questions of law and fact . . . arising from any action taken *or* proceeding brought to remove an alien." (Emphasis supplied.) The statutory language "action taken" is different than, and is in

addition to, the language "proceeding brought."[24]  "[S]ection 1252 (b)(9) is not limited to

challenges to singular orders of removal."  *Aquilar*, 510 F.3d at 14.  Upon termination of refugee

status, the USCIS is required by regulation to initiate removal proceedings.  8 C.F.R. 207.9.

Accordingly, because the USCIS's termination of Jama's refugee status triggered the removal

proceeding, it was an "action taken . . . to remove" Jama.  Thus, 8 U.S.C. § 1252 (b)(9) is

applicable.

> Additionally, as discussed above in Section V.A., Jama does have an avenue for review

of legal issues related to the USCIS's termination of his refugee status pursuant to 5 U.S.C. § 704

and 8 U.S.C. § 1252.  He may obtain such review in the Court of Appeals following the

completion of his removal proceedings in the Immigration Court and Board of Immigration

Appeals.

> For the reasons set forth above, the USCIS's termination of Plaintiff's refugee status

constitutes an action taken to remove an alien from the United States.  Therefore, review of the

termination decision is channeled by § 1252(b)(9) "with judicial review . . . vested exclusively in

the courts of appeal."  *Aquilar v. ICE*, 510 F.3d 1, 9-13 (1st Cir. 2007).

**C.      Under 8 U.S.C. § 1182(i)(2), this Court lacks jurisdiction to review the USCIS's
         denial of Plaintiff's request for a fraud waiver.**

> Jama's contention that this Court has jurisdiction to review the USCIS's denial of his

request for a waiver of his inadmissibility based on fraud is without merit.  Although 8 U.S.C. §

---

[24] S*ee Aquilar, 510 F.3d at 15* (petitioners' argument "would render the word "action" superfluous and effectively excise it from the statute," contrary to the "familiar canon of construction that, whenever possible, every word and phrase in a statute should be given effect.") (internal citation omitted).  *See also United States v. Menasche*, 348 U.S. 528, 538-539 (1955) ("It is our duty to give effect, if possible, to every clause and word of a statute.") (internal quotations and citations omitted); *Veneklase v. Bridgewater Condos, L.C.*, 670 F.3d 705, 711 (6th Cir. 2012) ("the rules of statutory construction require courts to give meaning to every word and clause in a statute.") (internal citation omitted).

1182 provides the Attorney General[25] with discretion to grant or deny a request for a waiver of inadmissibility based on fraud or misrepresentation, the same statute forecloses judicial review of that discretionary decision.  It provides:

> No court shall have jurisdiction to review a decision or action  . . . regarding a waiver under paragraph (1).

8 U.S.C. § 1182(i)(2).

Jama argues in his Opposition Brief that he is not seeking review of the merits of the USCIS's denial of his application for a fraud waiver.  Rather, he says he wants the Court to review the USCIS's "absolute refusal to adjudicate and render a legally reasoned decision on Mr. Jama's waiver application."  Doc. 26, p. 22.  This argument is disingenuous.  Jama's Complaint alleges that, although it should not have been denied, his application was in fact acted on and denied.  Doc 1, ¶¶ 53-54.  The Notice of Decision dated April 8, 2011, establishes that the USCIS did consider and deny Jama's I-602 application for a fraud waiver.  Doc. 24-1, pp. 27-28 (Ex. 4).  Moreover, the distinction Jama attempts to make is one without a difference.  When he says that the USCIS did not render "a legally reasoned decision on Mr. Jama's waiver application," it is clear that he wants this Court to review the merits of the fraud waiver denial, which this Court is barred by statute from doing.

Jama's reliance on *Patel v. Gonzales*, 432 F.3d 685 (6th Cir. 2005) and *Cervantes-Gonzalez v. INS*, 244 F.3d 1001 (9th Cir. 2001) to establish subject matter jurisdiction of the denial of his application for a fraud waiver is without merit.  In *Patel* and *Cervantes-Gonzalez*, the courts found that jurisdiction existed to determine whether the decision makers had applied the correct version of the Act.  *Patel*, 432 F.3d 685; *Cervantes-Gonzalez*, 244 F.3d 1001. Unlike the plaintiffs in *Patel* and *Cervantes-Gonzalez,* Jama does not allege that the USCIS

---

[25] In this case, it was the USCIS that denied Jama's application.

applied an incorrect version of the discretionary statute.

For the foregoing reasons, the Court lacks jurisdiction to consider Jama's request for review of the USCIS's denial of his application for a fraud waiver.

## VI. Conclusion and Recommendation

For the foregoing reasons, the undersigned recommends that Defendants' Motion to Dismiss be **GRANTED** and Plaintiff's Complaint be dismissed with prejudice.

Dated: June 18, 2013

Kathleen B. Burke
United States Magistrate Judge

## <u>OBJECTIONS</u>

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); s*ee also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).